IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>*Plaintiff*, )<br>)<br>v. )<br>)<br>**All Dogs Seized From 133 Bailey Lane, Allendale, SC 29810,** )<br>)<br>*Defendants* in rem. )<br>) | Civil Action No.:   1:23-198-JFA |

### UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE

The Plaintiff, the United States of America, brings this Complaint and alleges as follows, in accordance with Supplemental Rule G(2), Fed. R. Civ. P.

### NATURE OF THE ACTION

1. This is a civil action *in rem* brought to enforce 7 U.S.C. § 2156(f) for the forfeiture of all dogs that were seized from 133 Bailey Lane, Allendale, SC 29810 that were involved in a violation of the animal fighting venture prohibition section of the Animal Welfare Act, 7 U.S.C. § 2156. This action also seeks the forfeiture of any offspring these seized dogs may have before entry of a final order of forfeiture.

### DEFENDANTS *IN REM*

2. The Defendants *in rem* are pit bull type dogs seized from property in Allendale County associated with Leon Green. At the time of seizure, there were approximately eight pit bull type dogs located at 33 Bailey Lane, Allendale, South Carolina 29810, South Carolina.

### KNOWN POTENTIAL CLAIMANTS

1

3. The person known to the United States who may claim an interest in the Defendants *in rem* is Leon Green. The United States will provide direct notice of this action to this possible claimant.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355. Upon the filing of this Complaint, Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which Plaintiff will execute pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

5. Venue is proper pursuant to 28 U.S.C. § 1355(b) because acts and omissions giving rise to the forfeiture took place in the District of South Carolina.

## STATUTORY BASIS FOR FORFEITURE

6. The federal Animal Welfare Act, 7 U.S.C. § 2131, *et seq*., defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to sell, buy, possess, train, transport, deliver, or receive an animal intended for use in an animal fighting venture. 7 U.S.C. § 2156(b).

7. The Animal Welfare Act provides that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(f). Animals "seized under such a warrant shall be held by the United States marshal or other authorized

person pending disposition thereof by the court in accordance with this subsection." *Id.* In addition, "[n]ecessary care including veterinary treatment shall be provided while the animals are so held in custody." *Id.*

8. The statute also contemplates forfeiture of seized live animals. Specifically,

> [a]ny animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct.

*Id.* The costs incurred in caring for animals seized and forfeited under this section "shall be recoverable from the owner of the animals (1) if he appears in such forfeiture proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found, resides, or transacts business." *Id.*

9. As explained below, the Defendant *in rem* are animals "involved in . . . violation[s]" of 7 U.S.C. § 2156 and are therefore subject to forfeiture to the United States of America pursuant to 7 U.S.C. § 2156.

## FACTUAL BASIS FOR FORFEITURE

10. Dog fighting typically involves pit bull type dogs that are released by their owners or handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

11. Prior to a dog fight, dog owners or handlers may enter into an agreement with their opponent, often referred to as a "match," "fight," or "show." The owners or handlers may agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact Locations of which is often a secret until shortly before the

fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

12. Dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

13. Dog fighters often take steps to house fighting dogs away from public view, such as by placing them at the back of property lines, inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.

14. "Champion" or "Grand Champion" status refers to a dog who has won three or five fights, respectively.

15. It is common for successful dog fighters to sell Champions and Grand Champion dogs to other dog fighters and to breed and sell puppies from Champions and Grand Champions to other dog fighters.

16. In order to get a dog or puppy to the new owner, dog fighters will often employ the use of a fighting dog "transporter". Dog fighters will look for transporters that understand dog fighting and the need to transport these "fighting dogs" in such a manner that the dogs cannot interact. Transporters will often advertise their services in on-line forums used by dog fighters. In addition, dog fighters and breeders will share their "favorite" transporter with each other on these forms and by text messages.

17. It is common for fighting dog transporters to travel extensively from state to state picking up and delivering multiple fighting dogs to numerous locations. The customers of these

4

transporters will sometimes represent to the transporter that a dog is being transported for a specific fight; or for a "keep," i.e., to be prepared for a specific fight; or to be bred to a specific dog from a fighting "bloodline."

18. These transporters generally do not operate as a legitimate, registered, overt business, because they are aware of the intentions of their customers, and derive their income predominantly or exclusively from those engaged in illegal activities with the dogs. Such transporters frequently charge additional fees for transporting a dog with scars or injuries, because they know they will be bearing the risk of criminal liability for possessing or transporting the dogs if they are stopped by law enforcement during the transport.

19. Dog fighters may keep multiple dogs at a time in order to maintain a stock of dogs at different weights and both sexes for dogs to be matched for a fight according to weight and sex; to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting bloodline; and to have a sufficient number of dogs to fight dogs more than two to three times a year.

20. Finding an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year is known as "calling out a weight." Dog fighters often "call out a weight," by telephone, text, or e-mail, to known dog fighters in several states in order to increase their odds of finding a match.

21. Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked" or set up. The dog then typically undergoes a conditioning process which dog handlers refer to as a "keep." This keep may involve treadmills to run and exercise the dogs away from public view; weight pulls to increase the dog's strength and stamina; "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs (such as

steroids), vitamins, and other medicine. "Animal pelts" are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions.

22. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches.

23. Dog fighters often attempt to mend the injuries of their own dogs, rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries. Dog fighters also use veterinary supplements and pharmaceuticals to enhance fighting dogs' stamina and to keep injured dogs fighting longer.

24. Although dogs used for fighting are often housed outside, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before an upcoming match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

25. It is common for those operating dog fighting ventures to maintain pedigrees, books, records, ledgers, and journals relating to the purchase, transportation, sale, breeding, and training of fighting dogs. These materials can be found to exist in both hard and electronic copy. Dog fighters often maintain information regarding dog fighting activities in order to stay current with the dog fighting community. "Underground" dog fighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around

6

the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online versions of published magazines that serve the same purpose, as well as websites where dog fighters post pedigrees to demonstrate the fighting lineage of their dogs.

26. Dog fighters today tend to communicate via email, text messages, or website chat rooms dedicated to "game dogs." Dog fighters routinely hook matches and exchange documents, tips, photographs, or videos relating to dog fighting activities via electronic means. Dog fighters exchange videos, for example, to demonstrate the strength and gameness of their dogs.

27. On May 25, 2022, the Allendale County Sheriff's Office ("ACSO") contacted USDA-OIG regarding multiple complaints of animal cruelty and dog fighting at 133 Bailey Lane, Allendale, South Carolina 29801 ("SUBJECT LOCATION"). Upon arriving on scene, ACSO Deputy Evans (who is also an animal control deputy), along with Special Agent ("SA") Dustin McPhillips from USDA-OIG, observed several dogs in plain view located in the backyard of the SUBJECT LOCATION (no fence separated the front and back yard of the SUBJECT LOCATION).

28. ACSO Deputy Evans knocked on the door several times at the SUBJECT LOCATION; no occupants responded to the repeated knocks. Agents observed multiple closed-circuit television cameras positioned around the premises of the SUBJECT LOCATION.

29. The local weather at the time was clear and sunny, with the temperature hovering around eighty-eighty degrees Fahrenheit. ACSO Deputy Evans decided to make a health and welfare inspection of the dogs, due to the warm weather.

30. Deputy Evans along with SA McPhillips observed several dogs that were wearing heavy collars attached to heavy chains staked into the ground. The dogs appeared emaciated and displayed signs and symptoms of dehydration. Several of the dogs did not have adequate shelter from the elements. Some of the dogs did not have water, and the ones that did appeared to have only stagnant, green-colored water. All of the dogs were kept isolated from one another.

31. ACSO Deputy Evans and SA McPhillips also observed several dogs with severe scaring around their face, ears, and lower extremities. Based on their knowledge, training and experience, agents know that these wound patterns are consistent with dog fighting.

32. Based on the facts observed from the animal welfare check, ACSO Deputy Evans obtained a state search warrant.

33. ACSO proceeded to seize all dogs located at 133 Bailey Lane, Allendale, SC 29810.

34. During the search warrant, ACSO seized several pedigree documents which listed Leon Green as the purchaser and owner of the dogs. The pedigree listed "CH" referencing champion, meaning that the breed or lineage that the dog came from has won three consecutive dogfights.

35. During the execution of the search warrant, several photographs were seized, one of which showed a "rape stand" which is utilized to bind a female dog to a fixed structure in order to force her to breed with a male dog against her will.

36. During the execution of the search warrant, other dog fighting paraphernalia was observed and seized, including several heavy chains weighing approximately fifty to sixty pounds (50-60lbs), used to condition the necks of the dogs for the purpose and intent of dog fighting.

37. Officers also observed and seized a conditioning sled pulling device, a modified

springboard used to condition the dog's jaws for producing a stronger bite during the fights, and dog supplements.

38. Based on the information and allegations set forth herein, there is a factual basis to support a reasonable belief that the Government will be able to meet its burden of proof at trial to show that Defendants *in rem* are subject to forfeiture under the provisions of 7 U.S.C. § 2156(f).

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the Defendants *in rem*; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* be forfeited to the United States of America for disposition according to law; that the Court enter a judgment for costs associated with the care of the Defendants *in rem* pursuant to 7 U.S.C. § 2156(f) should any interested party file a claim for the Defendants *in rem*; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

s/Carrie Fisher Sherard
CARRIE FISHER SHERARD
(Fed. ID. #10134)
Assistant U.S. Attorney
U.S. Attorney's Office
District of South Carolina
55 Beattie Place, Suite 700
Greenville, SC 29601
Tel: (864) 282-2111

*Attorney for the Plaintiff*

DATED: January 13, 2023